9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lawrence Ozel LITTLE, Defendant-Appellant.
 No. 92-2340.
 United States Court of Appeals, Sixth Circuit.
 Nov. 4, 1993.
 
 Before KENNEDY and NORRIS, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Lawrence Ozel Little appeals his jury conviction and life sentence for killing a government witness and aiding and abetting the killing of a government witness, in violation of 18 U.S.C. Secs. 1512, 1111 and 2. On appeal, defendant argues (1) that the trial court erred in admitting his first confession because it was obtained in violation of his Fifth and Sixth Amendment right to counsel; (2) that the trial court erred in failing to suppress the first confession because the confession was the involuntary product of coercion; (3) that defendant's subsequent confessions should have been suppressed as "fruit of the poisonous tree"; (4) that an FBI agent's reference on cross-examination to a polygraph constitutes reversible error and also deprived defendant of his right to confront witnesses under the Sixth Amendment. For the reasons stated below, we affirm.
 
 I.
 
 2
 This case involves the murder of Robert Wilson, a suspected heroin courier who agreed to cooperate with the Drug Enforcement Agency (DEA) and testify on behalf of the government. On August 9, 1989, based in part on Wilson's testimony, a grand jury returned an indictment against Albert Lewis, Dwight Cameron and James Woodward, charging them with various drug crimes. Wilson was the primary witness against them. All three defendants pled guilty in the Fall of 1989. The defendants were scheduled for sentencing on January 4, 1990, when a problem arose over the plea agreements. The probation department calculated the sentencing guidelines and found that some of the plea agreements were well under the sentence required by the guidelines. In particular, Dwight Cameron's plea agreement was for 41 months but the guidelines calculated by the probation department had a range of 168 to 210 months. As a result of the plea complications, the court postponed sentencing until January 10, 1990, with a possibility of setting aside the pleas and going to trial.
 
 
 3
 On the evening of January 8, 1990, three men broke into Wilson's home in Inkster, Michigan, and fatally beat and stabbed him in the presence of his five-year-old son and fifteen-month-old daughter. In the house, Inkster police found two ski masks, several bloody knives and screwdrivers, and two bloodied baseball bats. They also found a broken part of a rifle stock. A short distance away, police discovered a van containing a large blood covered kitchen knife, the barrel portion of a rifle carbine and a usable fingerprint in the blood located on the rifle barrel. The rifle stock found in the house matched the barrel found in the van.
 
 
 4
 For several months, police had no suspects. Then, in the latter part of 1990, informants told the Federal Bureau of Investigation (FBI) that defendant had implicated himself in the murder of Robert Wilson. FBI agents secured a search warrant to obtain hair, blood, saliva and fingerprint samples from defendant. On November 30, 1990, FBI agents Farris Genide, Terry Booth and Robert Carter went to a prison in Adrian, Michigan, where defendant was incarcerated for an unrelated offense. Defendant was brought to the medical facility of the prison where Agent Genide presented defendant with the search warrant. Defendant asked if he was entitled to an attorney. Genide told him that he was not, that this was a search, and that even if an attorney were present, defendant would have to submit to the search.
 
 
 5
 After executing the search, Genide and prison personnel took defendant back to where two other agents were waiting. He was fingerprinted and then taken to an interview room with the three agents. Genide told him to say nothing and then read him his Miranda rights. Defendant stated that he understood his rights and signed a written waiver of his rights, and in response to a question of whether he wished to talk to the agents, he answered "yeah." Genide then told defendant to say nothing further until Genide was through speaking. Genide told defendant that they had evidence to believe he was responsible or shared responsibility for the Wilson murder and that if convicted, he could go to jail for life or could get the death penalty. Genide told defendant that he could avoid the death penalty by cooperating with the agents and telling the truth. Agent Booth told defendant that they had blood samples and fingerprints.
 
 
 6
 At first, defendant denied his involvement but within 45 minutes to one hour after the interview began, he confessed to taking part in the murder. Defendant's confession was reduced to writing by defendant (18 pages) plus several pages of questions and answers written by Agent Genide, each page of which was read and initialed by defendant. Defendant then signed the entire statement. In the written statement defendant said that the "hit" on Wilson was because he was a witness against some people. Defendant admitted to stealing a van with his brother, Darrin Little, and a man named "Tony" Anthony Ellis. They drove to Wilson's home and, wearing ski masks, entered Wilson's home through a side window. Defendant carried a rifle. After entering the house, defendant was confronted by Wilson. According to defendant, he looked into Wilson's eyes and was unable to pull the trigger. Wilson fled, followed by defendant, to a rear bedroom where defendant fought with Wilson. Defendant struck Wilson with the rifle, breaking the stock off. Defendant said that Wilson had a hold of Tony so defendant stabbed Wilson's hand after which Tony beat Wilson with a bat. Defendant also stated that Tony stabbed Wilson with a screwdriver. During the fight, Tony struck defendant's hand with the bat. Defendant was holding a knife in that hand and was cut causing his hand to bleed. Defendant also stated that there was a child in the bedroom during the assault. After it appeared that Wilson was dead, all three assailants fled out the side window and ran behind the house to the van parked on the block behind the house. They drove the van a short distance and abandoned it. The three then got into a car driven by Darrin and drove out of the area of the murder. Defendant stated that he was paid $500 for his part in the murder. During the interview, defendant showed the agents the scar on his hand that he incurred during the crime. The interview of defendant began at 11:33 a.m. and concluded at 5:50 p.m. There were periodic breaks during the interview to allow defendant to eat and to go to the lavatory.
 
 
 7
 After November 30, 1990, defendant called Agent Genide on several occasions and requested to meet with Genide. On December 18, 1990, Genide and Agent Booth went to the state prison at Jackson, Michigan to speak to defendant. The agents advised defendant of his rights. Defendant told the agents that a lawyer had told him not to talk to them. Upon hearing this, the agents began to leave the interview room. As they were leaving, defendant said he had something to tell them and proceeded to tell them a story at variance with his statement of November 30, 1990, especially with respect to the other persons involved. When the agents said they did not believe him, defendant admitted it was a lie, reaffirmed his story of November 30, 1990, and gave the agents additional details concerning the murder.
 
 
 8
 After the interview of December 18, defendant again called Genide to talk with him. On February 1, 1991, as a result of the contradictory statements made by defendant on December 18, 1990, the agents requested and defendant agreed to undergo a polygraph exam. Polygraph examiner Steven Kives tested defendant concerning the truth of his initial statement given on November 30, 1990. After the test was completed, Mr. Kives told defendant that he had failed the test. Thereafter, defendant told Kives another version of the murder which was a variance from his original statement of November 30. Kives administered another polygraph relative to this version of the murder. The results of this test were inconclusive.
 
 
 9
 On February 12, 1991, Agents Genide and Booth again spoke with defendant. Again the agents advised defendant of his Miranda rights and defendant waived them. Defendant gave another signed statement. This statement was consistent in some parts with the November 30, 1990 statement and inconsistent on other parts. In this statement, defendant changed the identities of the other murderers and several other details of the offense. Consistent with his November 30 story and with the physical facts of the crime, defendant admitted stealing the van, entering Wilson's house through a side window, striking Wilson with the rifle and breaking it, stabbing Wilson and being cut in the fight, taking a knife and part of the rifle to the van and abandoning the van.
 
 
 10
 FBI analyst John Mertens compared the blood discovered at the murder scene and defendant's blood obtained November 30, 1990. Mertens determined that the blood found on the ground behind Wilson's house, on the steering wheel of the van and on the barrel of the rifle found in the van belonged to defendant. FBI analyst James Rettburg determined that the fingerprint found on the rifle barrel was that of defendant.
 
 
 11
 In September, 1991, Robert Golen was incarcerated in the Wayne County Jail where he met defendant. Over a two and one-half week period, defendant told Golen about the murder of Robert Wilson. Defendant said that Wilson was killed because he was an informant, that the murderers wore ski masks and entered Wilson's house through a side window, that a rifle was used to assault Wilson, that there was blood all over the room, that a van was used to escape the murder scene and was abandoned, that children were in the house at the time of the murder and that federal agents had defendant's fingerprint on the gun.
 
 
 12
 On December 18, 1991, a grand jury in the Eastern District of Michigan indicted defendant for the murder of a government witness and the aiding and abetting of the same, in violation of 18 U.S.C. Secs. 1512, 1111 and 2. The District Court, after a hearing in which defendant did not testify, found that all of defendant's confessions were voluntary and admissible. On June 2, 1992, after a trial commencing on May 11, 1992, a jury convicted defendant. On October 8, 1992, the District Court sentenced defendant to a term of life imprisonment. Defendant appeals.
 
 II.
 
 13
 Defendant's first contention is that his confession of November 30, 1990, was obtained in violation of his Fifth and Sixth Amendment right to counsel and, therefore, the trial court erred by failing to suppress that confession. In ruling the confession admissible, the trial court observed that when defendant inquired about counsel upon presentation of the search warrant, he had no right to counsel. It found that after defendant was properly advised of his Miranda rights, he knowingly waived his right to counsel without reinvoking it. We agree.
 
 A. Sixth Amendment
 
 14
 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." U.S. CONST. amend. VI. The Sixth Amendment right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information or arraignment." United States v. Gouveia, 467 U.S. 180, 188 (1984). Defendant cites Maglio for the proposition that "[o]nce adversary proceedings begin against an individual, he or she has the right to legal representation when the government conducts an interrogation." Maglio v. Jago, 580 F.2d 202, 204-05 (6th Cir.1978), cited in Defendant's Br. at 10. Defendant argues that "there is no doubt that the investigation had focused on Defendant" and therefore defendant had a right to counsel. Defendant's Br. at 10. Defendant further argues that he invoked his right to counsel and that thereafter the police were precluded from initiating custodial interrogation against him without providing counsel.
 
 
 15
 We agree that once adversary proceedings have begun, defendant has a Sixth Amendment right to counsel during police interrogation. See Moran v. Burbine, 475 U.S. 412 (1986). A defendant who invokes this right to counsel for the purpose of interrogation may not subsequently waive that right until counsel has been furnished. Michigan v. Jackson, 475 U.S. 625 (1986). "The difficulty for [defendant] is that the interrogation sessions that yielded the inculpatory statements took place before the initiation of 'adversary judicial proceedings.' " Moran, 475 U.S. at 428 (emphasis in original). Defendant had not been charged, arraigned, indicted, or had any formal proceedings brought against him as regards the murder of Robert Wilson. Police custody is not sufficient to trigger the Sixth Amendment. See Moran, 475 U.S. at 431-32. Although defendant had a right to a lawyer, and apparently had had one with respect to the charges for which he was incarcerated, that right did not extend to the case at hand. See McNeil v. Wisconsin, 111 S.Ct. 2204, 2205 (1991) (Sixth Amendment is offense specific); Moran, 475 U.S. 412 (existing attorney-client relationship does not prevent defendant from waiving right to counsel before commencement of adversary proceedings). We conclude, therefore, that when defendant inquired whether he was entitled to counsel prior to the search, he had no Sixth Amendment right to invoke.
 
 B. Fifth Amendment
 
 16
 Defendant argues that once he inquired whether he was entitled to counsel for the search, agents violated the Fifth Amendment by subsequently initiating interrogation. Agent Genide's response that he was not entitled to counsel for the search was correct.
 
 
 17
 In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that the prosecution may not use a defendant's statements obtained through custodial interrogation unless, prior to questioning, the defendant is informed of certain rights, including the right to an attorney. Edwards v. Arizona construed Miranda to require that police refrain from initiating custodial interrogation once a defendant has requested counsel until counsel has been made available to the defendant unless the accused initiates further communication. See Edwards, 451 U.S. 477, 484-85 (1981). The Miranda-Edwards safeguards are designed to protect a criminal defendant's privilege against self-incrimination secured by the Fifth Amendment. That privilege, however, "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." Schmerber v. California, 384 U.S. 757, 761 (1966). Requiring a defendant, as in the present case, to provide the police with fingerprints, blood, saliva, and hair samples is not protected by the Fifth Amendment, but rather is analyzed as a search under the Fourth Amendment. "The distinction ... is that the [Fifth Amendment] privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." Id. at 764. Because the Fifth Amendment does not apply to the search of defendant, he had no Miranda right to counsel for that purpose.
 
 
 18
 By describing the agents' visit as a "single transaction," however, defendant seems to suggest that his inquiry regarding his right to counsel was for the purpose of not only the search but the subsequent interrogation as well. As such, defendant argues, Edwards prohibited the agents from initiating interrogation until counsel was provided. The question for this Court then is whether a suspect's inquiry regarding his right to counsel at the time of a search can serve as a request for counsel for an interrogation immediately following the search.
 
 
 19
 The rule in Edwards applies when the suspect has expressed "his wish for the particular sort of lawyerly assistance that is the subject of Miranda. It requires, at a minimum, some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." McNeil, 111 S.Ct. at 2209 (citing Edwards, 451 U.S. at 484). In Jackson, 475 U.S. at 625, the Supreme Court held that once an accused invokes his Sixth Amendment right to counsel, any statements obtained from the accused during subsequent police-initiated custodial interrogation regarding the charge at issue are inadmissible. The Court stated that because our "settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel--we presume that the defendant requests the lawyer's services at every critical stage of the prosecution." Id. at 633. More recently, the Supreme Court held in McNeil that a defendant's request for counsel does not prevent the police from initiating interrogation for an unrelated offense. McNeil, 111 S.Ct. at 2209. The Court refused to find that the reasonable construction of a defendant's request for counsel in one case implied a request for counsel for all cases "since suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions." Id.
 
 
 20
 Attention to the Miranda-Edwards line of cases, however, demonstrates that an expressed desire for counsel for the purpose of interrogation is not enough; for the right to counsel to be invoked, the right must also exist at the time the request is made. The Supreme Court has "in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than 'custodial interrogation.' " McNeil, 111 S.Ct. at 2211. See Edwards, 451 U.S. at 484 ("[a]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities....") (emphasis added). To apply Edwards to this case would be to permit defendant to invoke his Fifth Amendment right to counsel at a time, the search, when the right had not yet attached through a question which was not even a request for counsel. We decline, as did the Supreme Court, to permit such an extension. See McNeil, 111 S.Ct. at 2211 ("The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect."). Because we hold that defendant invoked neither a Fifth nor Sixth Amendment right to counsel, any subsequent waiver to FBI-initiated interrogation would be effective. The remaining question is whether the District Court correctly found the waiver was voluntary.
 
 III.
 
 21
 Defendant argues that the trial court erred in failing to suppress his confession of November 30, 1990, because the confession was the involuntary product of coercion. The test for voluntariness of a confession involves three factors: (1) whether the police extorted the confession from the accused by means of coercive activity; (2) whether the police activity, if objectively coercive, was sufficient to overbear the will of the accused; and (3) whether the accused proved that his will was in fact overborne by the coercive police activity in question. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988), cert. denied, 490 U.S. 1020 (1989) (citations omitted). If the police misconduct at issue was not the "crucial motivating factor" behind defendant's decision to confess, the confession may not be suppressed. Id. at 459 (citing Colorado v. Connelly, 479 U.S. 157, 164 (1986)).
 
 
 22
 When a defendant challenges the voluntariness of a confession, the government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. United States v. Wrice, 954 F.2d 406, 410 (6th Cir.), cert. denied, 112 S.Ct. 2286 (1992) (citations omitted). In determining the voluntariness of a confession, this Court will not disturb the trial court's findings concerning specific events surrounding the confession unless clearly erroneous. Id. at 411 (citing United States v. Murphy, 763 F.2d 202, 206 (6th Cir.1985), cert. denied, 474 U.S. 1063 (1986)). However, this Court must independently determine how the accused reacted to the events and the legal significance of how he reacted. Wrice, 954 F.2d at 411. The issue is whether the will of the accused has been overwhelmed by official pressure. Id.
 
 
 23
 Defendant cites four factors in support of his claim of involuntariness. First, defendant argues that his request for counsel was improperly denied and that he was led to believe he could not have an attorney for any purpose including interrogation. Second, defendant claims that agents told him they had certain incriminating evidence which the agents knew they did not in fact have. Third, defendant argues, agents told defendant he would receive the death penalty unless he cooperated. Finally, defendant claims he was unable to assert his rights because Agent Genide had ordered him to remain silent during questioning. Defendant argues that the agents' conduct was coercive and was the crucial motivating factor behind defendant's decision to confess. Defendant's Br. at 16.
 
 
 24
 The District Court found instead that defendant was not denied his right to counsel because, first, at the time defendant inquired about his right to counsel, he had no right to one and, second, that he waived his right to counsel after FBI agents adequately informed defendant of his rights. The court further found that defendant was not improperly promised immunity but rather agents told defendant that they would not seek the death penalty if he cooperated. The court found that agents did not deliberately lie about the evidence they had although they may have suggested they knew more than they did. The court also noted that defendant was not interrogated for inordinately long. The court found no evidence to suggest that defendant did not understand and knowingly waive his rights: "I rarely have a case before me where anybody had the Miranda Rights read to them so many times. And nothing suggests that Lawrence Little didn't know exactly what he was doing." Joint App. at 119.
 
 
 25
 We do not find these findings clearly erroneous. The agents' testimony was not rebutted. According to their testimony, defendant's inquiry regarding counsel was at the time of and pertained to the execution of the search warrant, and that defendant was told to save any further questions until after the search. They also testified that before agents questioned defendant, defendant was read his rights, read them himself, said he would talk to them, and signed the waiver form. Agents testified that they told defendant his crime carried the death penalty but that, if he cooperated, they could assure him that he would not receive the death penalty. They testified that the United States Attorney's Office had authorized them to make this commitment. Thus, although agents did promise the government would not seek the death penalty, they did not promise immunity from prosecution.
 
 
 26
 There is evidence that the agents deliberately misled defendant concerning the evidence they had against him. Although Agent Booth testified he told defendant they had blood and fingerprint evidence, Agent Genide testified he told defendant that they had his fingerprint on the murder weapon. Defendant's fingerprint, it turned out, was on a rifle barrel used in the murder, but at the time Genide made the statement, no comparison of the fingerprint on the rifle with defendant's print had been made. Agent Genide also admitted that in order to conceal the source of the information that defendant participated in the murder, he purposely led defendant to believe that one of defendant's cohorts had provided agents with that information. This was not true. Whether agents deliberately "lied" is not clear but agents did mislead defendant regarding the strength of the evidence against him.
 
 
 27
 The District Court did not explicitly make any findings regarding whether defendant was told to remain silent during questioning. The record does establish that after defendant was informed of his rights, signed the waiver and said he would talk to the agents, Genide told him to keep quiet and listen while the agent told him about the crime being investigated. However, it is equally clear that defendant did ask the agents questions during their recital.
 
 
 28
 Given these facts, our task is to independently determine whether the official conduct at issue was sufficient to overwhelm defendant's will. See Wrice, 954 F.2d at 411 (citing Murphy, 763 F.2d at 206). As discussed in part II supra, we find that defendant's right to counsel was not violated. We also affirm the District Court's finding that defendant waived his Miranda rights when he agreed to talk and signed the waiver.
 
 
 29
 Defendant contends that when Agent Genide told him to keep quiet until Genide was done speaking, the message Genide conveyed was that defendant should not request an attorney or say that he does not want to speak to the agents. Even if defendant had waived his rights, defendant argues, he was prevented from reinvoking them. We are unpersuaded. Defendant was given the opportunity to request a lawyer after he was read his rights. He was asked if he understood them and he responded that he did. He was asked if he wished to talk to the agents to which he responded "yeah." The Miranda waiver form that defendant signed specifically stated that "[i]f you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer." Joint App. at 31. We also note Genide's unrefuted testimony that defendant asked Genide who it was that provided the agents with information. Joint App. at 84. If defendant could ask this question, he could have asked for a lawyer instead. As the trial court observed, "[i]f he [chose] to talk without first speaking to counsel, that was a decision that he made." Joint App. at 116.
 
 
 30
 As to the agents' statements that defendant would not receive the death penalty if he cooperated, we recognize that "a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary." Wrice, 954 F.2d at 411. Defendant refers us to Williams v. Withrow, 944 F.2d 284 (6th Cir.1991), cert. granted, 112 S.Ct. 1664 (1992), in which this Court affirmed a district court's finding of involuntariness. In that case, the police questioned defendant Williams at the police station about a murder without informing him of his Miranda rights. In addition, the police told Williams that they were not interested in him but only "the shooter." Williams then made inculpatory statements. On another day, police questioned Williams again, after reading him his rights, and told him that if he did not "come clean," he would be formally charged and incarcerated but if he cooperated, he would "walk" immediately. This Court found that the illusory "promises of leniency, coupled with threats of immediate imprisonment" constituted coercive conduct. Williams, 944 F.2d at 289.
 
 
 31
 On certiorari, the Supreme Court reversed this Court's and the trial court's finding of involuntariness in Williams on the ground that the issue was not presented in the habeas petition. Withrow v. Williams, 113 S.Ct. 1745 (1993). Therefore, our finding of involuntariness does not control us here. Even if it did, however, we find this case distinguishable. Here, the agents' promises were not illusory. The agents' unrefuted testimony was that they had consulted with the United States Attorney who authorized them to promise that the government would not seek the death penalty if he cooperated. The agents were not "leading the defendant to believe that he ... will receive lenient treatment when this is quite unlikely," United States v. Long, 852 F.2d 975, 978 (7th Cir.1988), but rather the agents made an offer of a reduced penalty that was authorized by the prosecution and thus capable of being carried out. Such an inducement is not improper. Id. at 976 (It is proper for police officers, after consulting with United States Attorney's Office, to obtain confession in exchange for promise that sentences for separate crimes would run concurrently.); United States v. Harris, 914 F.2d 927, 933 (7th Cir.1990) ("[P]olice are free to solicit confessions by offering to reduce the charges against the defendant.").
 
 
 32
 Finally, defendant argues that he was coerced in part by the misrepresentation by the agents concerning the evidence they had against him. Agent Genide admitted that he misled the defendant to believe that a co-conspirator had provided the agents with information. Not every deception by the police, however, amounts to coercion or even impropriety. Harris, 914 F.2d at 933 ("[I]t is well settled that police may use small deceptions while interrogating witnesses."). In fact, the Supreme Court has held that a deception similar to that in this case did not invalidate a confession. See Frazier v. Cupp, 394 U.S. 731, 739 (1969) (holding that false statement by police that defendant's companion had confessed was insufficient to make defendant's confession inadmissible). Moreover, the defendant bears the burden of proving, under the totality of the circumstances, that his will was overborne by the police activity in question. McCall, 863 F.2d at 459. Reviewing the circumstances in this case, we find that the defendant has not proved that the agents' conduct so overwhelmed his will as to render his confession involuntary. Defendant, who was already serving a sentence in an unrelated matter, was not a novice.
 
 IV.
 
 33
 Defendant alleges that all of his confessions made to agents subsequent to November 30, 1990, should have been suppressed as "fruit of the poisonous tree" pursuant to Wong Sun v. United States, 371 U.S. 471 (1963). As discussed in part III supra, the confession of November 30, 1990, was voluntary and therefore there is no "poisonous tree" tainting the subsequent confessions. However, even if we were to conclude that the first confession was involuntary, the subsequent confessions are not necessarily inadmissible. Defendant argues that his second confession of December 18 was a variation of the first and therefore he would not have made the second confession had he not been coerced into making the first. The question is not, however, whether the first confession caused the second confession but whether the second confession was voluntary. See United States v. Daniel, 932 F.2d 517, 519-521 (6th Cir.), cert. denied, 112 S.Ct. 252 (1991). Although the Supreme Court has recognized the psychological effect of the "cat out of the bag" theory to the extent that the later confession may always be partially the result of the first, United States v. Bayer, 331 U.S. 532, 540 (1947), the Court held that a coerced confession does not "perpetually disable[ ] the confessor from making a usable one" in new circumstances. Id. at 541.
 
 
 34
 In Bayer, the Court ruled that an involuntary confession made while the defendant was confined in a psychopathic ward of a hospital did not preclude the use of a second confession made six months later when the defendant was confined only to the base where he was stationed. The second confession was substantially the same as the first, the defendant was given a copy of his first confession before making the second, and the second confession was referred to as "supplementary." Id. at 540. Notwithstanding this connection with the first confession, the Court held that the passage of time, the less restrictive environment in which the second confession was made, and the fact that the defendant was warned prior to giving the second confession, created a sufficient break from the first to make the second voluntary.
 
 
 35
 In a more recent case, this Court admitted a confession subsequent to a coerced confession. Daniel, 932 F.2d 517. We found the second confession voluntary because a day had lapsed between the confessions, the defendant had been moved to a different place, the interrogating officer was different, and the second confession was taken after Miranda warnings were given. In the present case, eighteen days elapsed before the second confession, the interview was at a different location from the first confession, and agents carefully advised defendant of his rights. In addition, unlike Daniel, the defendant in this case initiated contact with the officers even after he was instructed by counsel not to speak with them. Moreover, when defendant told agents about his lawyer's instruction and the agents began to leave, defendant stopped them and proceeded to make the second confession. "These factors, taken together, show a knowing and intelligent waiver of the right to remain silent and consult counsel before making a statement." Daniel, 932 F.2d at 521. Thus, assuming the involuntariness of the first confession, we still find that the second confession was properly admitted.
 
 
 36
 Because the November 30 statement was admitted, assuming it was involuntary, we would need to subject that statement to the harmless error analysis of Arizona v. Fulminante, 111 S.Ct. 2067 (1991) (extending to involuntary confessions the harmless error analysis of Chapman v. California, 386 U.S. 18 (1967)). Under Fulminante, the admission of an involuntary confession does not require reversal if it is harmless beyond a reasonable doubt. In the present case, the confessions of December 18, 1990, and February 1, 1991, were just as inculpatory as the confession of November 30, 1990. In fact, they were more so. The only difference between the first and subsequent confessions with respect to defendant's role in the crime is that only the first confession contained the statement that defendant was unable to shoot Wilson when defendant first confronted him. Defendant argued to the jury that his inability to shoot Wilson constituted an abandonment of his premeditated intent to murder Wilson and thus he was not guilty of premeditated murder. Joint App. at 352-53. The first confession added little, if anything, to incriminate defendant but it did provide defendant with a defense to the most serious charge. Therefore, assuming the first confession was involuntary, its admission was harmless beyond a reasonable doubt.
 
 V.
 
 37
 Defendant argues that Agent Genide's reference on cross-examination to a polygraph constitutes reversible error. Although the results of the test were not revealed, defendant argues that the jury might have inferred either that defendant refused to take the test or that he failed it. This Court holds all polygraph evidence inadmissible. United States v. Murray, 784 F.2d 188, 188 (6th Cir.1986) (citing United States v. Fife, 573 F.2d 369 (6th Cir.1976), cert. denied, 430 U.S. 933 (1977)). Not every reference to a polygraph, however, requires a new trial. Murray, 784 F.2d at 189. A curative instruction or the strength of other evidence may render the remark harmless. See United States v. Walton, 908 F.2d 1289, 1293-94 (6th Cir.), cert. denied, 498 U.S. 990 (1990).
 
 
 38
 Our cases establish two standards of review for determining whether a polygraph reference was harmless. If the error is of a constitutional magnitude such as "in a case where the polygraph reference is to a defendant failing or refusing to take a polygraph," then the error is reversible unless harmless beyond a reasonable doubt. Walton, 908 F.2d at 1294 (construing Murray ). If, on the other hand, the reference is not to a defendant, we reverse only if (1) an inference about the result of the test may be critical in assessing the witness' credibility, and (2) the witness' credibility is vital to the case. See Walton, 908 F.2d at 1293. The present case, like Murray, involves an FBI agent's statement that he had asked the defendant to submit to a polygraph. We therefore apply the harmless beyond a reasonable doubt standard of Murray rather than the two-step analysis of Walton.
 
 
 39
 In Murray, we held that an agent's statement that he asked the defendant to submit to a polygraph required a new trial. The agent had deliberately mentioned the polygraph and the other evidence of guilt was not so overwhelming as to make the error harmless beyond a reasonable doubt. In the present case, there is no indication that Genide's reference was deliberate. The statement was elicited by defense counsel, not the government, and it was not unresponsive to defense counsel's question. The question asked Genide if at some point on February 1, 1991, Genide told the defendant that he was being deceptive relative to the November 30 statement. Genide answered that he didn't recall saying that but that he had told defendant that he wanted him to take a polygraph and that such was standard procedure.[1] Joint App. at 307. On further cross-examination, Genide acknowledged that he also told defendant he did not believe the November 30 statement. Genide's response may have revealed too much about the conversation in question, but that conversation was the object of defense counsel's inquiry.
 
 
 40
 We further find that the other evidence in this case was overwhelming. The government admitted into evidence two confessions, written and signed by defendant, describing the crime scene with details that were corroborated by evidence discovered by the police. The police matched both defendant's blood and fingerprint to the murder scene. In addition, Robert Golen testified at trial to the confession made to him by defendant. We believe that the strength of this incriminating evidence and the inadvertence of Genide's remark sufficiently distinguishes this case from Murray and makes the polygraph reference harmless.
 
 
 41
 We also find an additional reason why the remark was harmless, it did not incriminate the defendant. In Murray, the defendant denied criminal conduct throughout the investigation. 784 F.2d at 190-91 (Krupansky, J. concurring). Although the agent's statement in Murray was only that he asked the defendant to submit to a polygraph and did not disclose the results, that reference suggested that the defendant either took and failed the polygraph or refused to take it, which in turn incriminated the defendant. See Walton, 908 F.2d at 1293 (construing Murray ). The Murray jury could infer that the prosecution would not have proceeded unless the polygraph results inculpated the defendant. In this case, however, the defendant had admitted rather than denied guilt at the time the polygraph was proposed. The polygraph was intended to verify the first confession of November 30, 1990. The subsequent prosecution of defendant did not suggest that he failed or refused to take the polygraph because, if the test found defendant's confession to be truthful, the prosecution would still be justified. Indeed, a finding that defendant lied when he confessed might suggest that he was not guilty. Furthermore, since both the defendant and prosecution relied on the November 30 confession, it is doubtful that the jury disbelieved it. We also note the strong curative instruction made by the trial court.[2] Under these circumstances, any minimal prejudice caused by the polygraph reference was harmless beyond a reasonable doubt.
 
 VI.
 
 42
 Finally, defendant argues that Agent Genide's reference to the polygraph deprived defendant of his right to confront witnesses under the Sixth Amendment. First, defendant argues that he was prevented from effectively cross-examining Agent Genide as to what the defendant said in their conversation on February 1, 1991, because the jury would be constantly reminded of the polygraph examination. Second, defendant claims that he was prevented from calling polygraph examiner Steven Kives as a witness to impeach the credibility of government witnesses, especially Agent Genide, because the jury would determine that Kives had administered a polygraph.
 
 
 43
 The Confrontation Clause of the Sixth Amendment guarantees the defendant in a criminal prosecution the right to confront the witnesses against him. U.S. CONST. amend. VI. This right is not absolute, however, but may be reasonably limited if, for instance, the proposed evidence is only marginally relevant. Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Since cross-examination may be limited, "a party whose prospective questioning is threatened with curtailment should make all reasonable efforts to alert the court to the relevance and importance of the proposed questions. Unless clearly barred by the trial court, the party should make an offer of proof on the record." Jones v. Berry, 880 F.2d 670, 673 (2d Cir.1989). Such an offer enables the trial court to asses the importance of the intended testimony and preserves the record for appellate review.
 
 
 44
 In this case, defendant made no offer of proof as to the substance of the "excluded" testimony. As to the cross-examination of Agent Genide, defendant made no complaint as to his ability to continue the cross-examination after the polygraph let alone identify the responses he hoped to elicit. As to defendant's inability to call Mr. Kives, defendant stated:
 
 
 45
 There's another witness who [sic] I was considering calling, that's Mr. Kives who is, of course, the polygraph expert. I do have a few reasons, I suppose, for wanting to call him, although I may be able to accomplish that with the next two witnesses.
 
 
 46
 Joint App. at 316A. This hardly amounts to an offer of proof especially since the defendant downplayed the importance of calling Kives by stating that two other witnesses may suffice. See United States v. Garcia, 531 F.2d 1303, 1307 (5th Cir.), cert. denied, 429 U.S. 941 (1976) ("It is impermissible for defense counsel to intentionally or inadvertently, to couch his grounds for admissibility in such obscure terms before the trial court, reserving for the appeal a precise statement of grounds."). The insufficiency of defendant's offer of proof is also illustrated by defendant's brief on appeal wherein defendant's appellate counsel states, "[d]efense counsel had planned to examine Mr. Kives, the polygraph examiner, apparently to underscore inconsistencies in the testimony of the other government witnesses." Defendant's Br. at 22 (emphasis added). Because defendant made no offer of proof, we review for plain error. See Fed.R.Evid. 103(a)(2) and (c). See also Berry, 880 F.2d at 673 (failure to offer proof of excluded testimony is reviewed for plain error on appeal); Garcia, 531 F.2d at 1307 (same).
 
 
 47
 Looking to the record, the apparent purpose of defendant's cross-examination of Agent Genide was to show that the statements of February 1 and February 12, 1991, were made only after the agents told defendant that they didn't believe his confession of November 30, 1990, and that these later statements were nothing more than a desperate attempt by defendant to tell the agents something they would believe even though defendant had been truthful on November 30. Defendant's Opening Statement, Joint App. at 124-25; Defendant's Closing Statement, Joint App. at 345-346, 349-351. The question that elicited the polygraph reference was whether Genide or other agents told defendant, on February 1, 1991, that they did not believe his November 30 statement. In response, Genide said he did not recall saying that but that he had told his superiors that defendant was telling the truth. Through further examination following the polygraph reference, Genide admitted that on February 1 agents had told defendant they did not believe his November 30 statement. Joint App. at 311. Genide also admitted telling defendant on December 18 that they did not believe defendant's December 18 statement. Joint App. at 309. Thus, defendant not only obtained the response he desired regarding what agents told him, but he demonstrated inconsistencies in Genide's testimony.
 
 
 48
 As to the purpose of calling Mr. Kives, who's involvement in the case was limited to February 1, defendant apparently sought to demonstrate that on that date agents told him that they no longer believed his November 30 statement. As already noted, defendant established this through Agent Genide. Also, defendant elicited from Agent Booth that defendant was told on or before February 12, 1991, that the agents no longer believed his November 30 statement. Joint App. at 331-32. Accordingly, defendant was not erroneously denied the right to confront witnesses or to present favorable evidence to the jury.
 
 VII.
 
 49
 For the reasons stated above, the defendant's conviction is AFFIRMED.
 
 
 
 [1]
 The passage consisted of the following:
 DEFENSE COUNSEL: On February 1st, you and another agent went to see Mr. Little, again, February 1 of '91?
 GENIDE: Yes.
 DEFENSE COUNSEL: And on that occasion after indicating the same story, the same things that he had said initially, am I correct that you and/or the other agent indicated to him that you didn't believe him he's being deceptive?
 GENIDE: I don't recall what I indicated to him.
 I did indicate to him we wanted him to take a polygraph and that this was standard procedure because I had explained to my superiors this man was telling me the truth.
 Without a polygraph--they're going to ask me did you polygraph the guy, I'd have to you know give him some type of excuse if I did not we wanted to verify what he had told us was the truth.
 DEFENSE COUNSEL: Your Honor, can we take a break at this time?
 COURT: Very Brief. Five Minutes.
 
 
 [2]
 Following Agent Genide's polygraph reference, defense counsel requested and received a recess. After an extensive discussion, the Court denied defendant's motion for a mistrial and gave the following instruction to the jury:
 Members of the jury, before we proceed, I ask you to listen very carefully to the court's special instruction. Any reference, now, by this witness to a desire to administer a polygraph, has no place in these proceedings. Whether a polygraph was or was not administered is totally irrelevant. Polygraph results are not admissible as evidence as the results are considered to be unreliable.
 Joint App. at 307A-308.