**UNITED STATES of America, Plaintiff,**

**v.**

**Eliseo Caldera ALVAREZ, Jr., Raul Santiago Gonzales–Garcia, and Dale Brian Jones, Defendants.**

**No. 1:98–CR–110.**

United States District Court, W.D. Michigan, Southern Division.

March 26, 1999.

**714**

Paul J. Denenfeld, Asst. Fed. Defender, Federal Public Defender, Grand Rapids, MI, David Stebbins, David C. Stebbins, Attorney at Law, Columbus, OH, for Eliseo Caldera Alvarez, Jr., defts.

Lawrence J. Phelan, Grand Rapids, MI, Keith A. Spielfogel, Chicago, IL, for Raul Santiago Gonzales–Garcia, deft.

Raymond S. Kent, Law Offices of Ray Kent, P.C., Grand Rapids, MI, for Dale Brian Jones, deft.

Pedro Ferrer, Pedro Ferrer, PC, Grand Rapids, MI, for Reynaldo Rios, Jr., deft.

John C. Bruha, U.S. Attorney's Office, Grand Rapids, MI, for U.S. Attorneys.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

QUIST, District Judge.

Defendant, Raul Santiago Gonzales–Garcia, is charged with conspiracy to possess with intent to distribute marijuana and the murder of Edward Perez while engaged in the conspiracy. Defendant moved to suppress statements that he made on July 21, 1998, to law enforcement agents. Defendant claims that he could not understand his *Miranda* rights when they were read to him in English, and he claims that his statement was coerced by threats from the officers who questioned him.

The Court heard testimony and argument on March 8 and 9, 1999. The facts set forth below are this Court's findings based upon this Court's assessment of the evidence.

### Facts

On July 21, 1998, Special Agent Michael Swidwinski of the Drug Enforcement Administration and Detective Chester Bush of the Kent County Sheriff's Department went to the Reynaldo J. Lopez State Jail in Edinburg, Texas, where Defendant was incarcerated on an unrelated marijuana charge. The trip had a twofold purpose: to arrest another person and to talk with

Defendant, a Mexican national, about his possible role in a marijuana conspiracy and the murder of Edward Perez. Defendant had already been indicted in the Western District of Michigan for these offenses.

Defendant is a 24 year old Mexican national who had been in the United States for three years. He had about nine years of formal education in Mexico during which he studied rudimentary English for about three years. Defendant has also studied English and has watched American television while incarcerated in the United States. Defendant testified, and he appears to be a person of at least average intelligence.

Defendant has experience with the American criminal justice system. He was previously arrested twice in Texas on unrelated charges and advised of his *Miranda* rights in Spanish. Defendant testified that he understood these rights when he was arrested on those occasions.

When they arrived at the Lopez jail, Swidwinski and Bush requested Assistant Warden Robert Balli ("Balli"), to allow them to interview Defendant. Balli, a Hispanic, grew up near the Mexican border, is bi-lingual, and is a "certified" Spanish translator within the Texas prison system. Balli said that Swidwinski and Bush could see Defendant only if Defendant wanted to see them. Balli then asked Defendant, in Spanish, if he was willing to talk with the officers, and Defendant said he was.

Swidwinski and Bush then began to interview Defendant in a contact visitation room. Defendant was not in restraints. At the beginning of the interview, there was some question about whether the Defendant could understand and speak English. Therefore, Balli was asked to translate the conversation.

After some brief small talk, Agent Swidwinski read to Defendant, in English, Defendant's *Miranda* rights. As he was being read his *Miranda* rights, Defendant nodded his head as if he understood his rights. When Swidwinski finished reading Defendant his *Miranda* rights, he gave Defendant a card which set forth these rights in English on one side and Spanish on the other side. Defendant looked at the card, but testified that he really did not read his rights in Spanish. Balli asked Defendant in Spanish if he understood his rights and whether he wanted to talk with the officers. Defendant responded in Spanish that he understood and would talk.

During the first part of the interview, Balli translated pretty much word for word.[1] Swidwinski informed Defendant that he was charged with murder and that the range of penalties was from 20 years imprisonment to death. The officers also informed defendant of the evidence that they had against him, including a bloody palm print that was found on the scene of the crime which had been identified as Defendant's print. Agent Swidwinski told Defendant that this was his last chance to cooperate and that he, Swidwinski, would stand up for him and tell the court that Defendant did cooperate if, indeed, he did so. However, the officers did not make any promise to Defendant that he would actually avoid the death penalty.[2]

After translating for some period of time,[3] Balli stopped translating because Defendant indicated that he understood what was being said. Defendant raised his hand and indicated to Balli that Balli should stop translating for him. (*See* 3/8/99 Hr'g. Tr. at 18–19.) From that point, the entire remainder of the interview was conducted in English because

---

1. The Court admits that it is strange that this part of the conversation was translated but reading of Defendant's *Miranda* rights were not translated.

2. The government has decided that it will not seek the death penalty against Defendant.

3. Balli testified that he translated only about twenty-five percent of the interview. Detective Bush estimated that about fifty percent of the interview was translated.

Defendant indicated that he understood it. Balli testified as follows:

> Initially, I was translating pretty much word for word. The more the conversation went on and the questions went on, there was even a time when the offender just said blankly, "I understand what he's saying," and was speaking English probably just as good as I am today.

(*Id.* at 14.) Balli speaks very good English, as English is his first language.

At all times during the interview, Defendant's responses to the questions were appropriate to the occasion. During the interview, Defendant admitted to being at the Perez farm when the homicide occurred, but he denied any involvement in the murder.

After the interview, as Balli was walking with Defendant, Defendant told Balli that he was relieved to have spoken about his involvement in the crime under investigation.

## Discussion

### I. Waiver of *Miranda* Rights

 Defendant first contends that his statements must be suppressed because his waiver of his *Miranda* rights was not knowing and intelligent. The Government bears the burden of proving by a preponderance of the evidence that Defendant voluntarily waived his *Miranda* rights. *See Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). The central inquiry in determining whether a waiver was voluntary is whether the police engaged in coercive activity. "The voluntariness of a waiver ... has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.* at 170, 107 S.Ct. at 523. There are two aspects to a valid waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Whether a valid waiver occurred depends upon the totality of the circumstances. *See id.*[4]

Defendant contends that he did not waive his *Miranda* rights because he did not understand his rights when they were read to him in English. "One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner." *United States v. Heredia–Fernandez,* 756 F.2d 1412, 1415 (9th Cir.1985).

For example, in *United States v. Garibay,* 143 F.3d 534 (9th Cir.1998), the Court of Appeals reversed a district court's finding that the defendant made a knowing and intelligent waiver of his *Miranda* rights because, among other things, the defendant was a person of low intelligence, with no experience in the criminal justice system, whose native language was Spanish, and who produced independent evidence of his inability to understand English. *See id.* at 538–39. Moreover, although Spanish speaking translators were available to assist in advising the defendant of his rights, they were not brought in to translate. *See id.* at 538. In contrast, in this case, Defendant is a person of at least average intelligence, with experience in the criminal justice system, whose native language is Spanish but who speaks responsively and intelligently in English, and who produced no independent evidence of an inability to understand and speak English.

---

4. The Government has not argued that 18 U.S.C. § 3501, rather than *Miranda,* applies to the waiver inquiry in this case. *See United* *States v. Dickerson,* 166 F.3d 667 (4th Cir. 1999).

Thus, the instant case is more like those cases which uphold a waiver even though the defendant's native language was not English. In *United States v. Lugo*, 170 F.3d 996 (10th Cir.1999), a case decided one day after the hearing in this case was concluded, the court found that the defendant, whose first language was Spanish, understood his rights and voluntarily waived them. *See id.* at 1004. Although the defendant had only a ninth grade education in Mexico, the court found that the defendant "was not unusually susceptible to coercion based on age, intelligence and education," and the evidence demonstrated that the defendant had a sufficient understanding of the English language for purposes of interrogation because the defendant indicated to the interrogating officer that he understood the rights as they were being read to him in English. *Id.; see also Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989)(finding that "[e]ven though his proficiency in the English language may have been limited, it did not prevent [the defendant] from making a knowing and intelligent waiver of his" rights where the evidence showed that the defendant spoke in broken English and occasionally lapsed into Spanish, but indicated on each occasion that he was advised of his rights that he understood them).

Under facts similar to those in this case, the court in *United States v. De Yian*, No. 94 CR. 719(DLC), 1995 WL 422019 (S.D.N.Y. July 18, 1995), held that the defendant, whose primary language was Chinese, had a sufficient understanding of English to permit him to make a knowing waiver of his rights. The defendant was interviewed in prison by a police officer, and a corrections officer was present. The police officer testified that the defendant acknowledged that he understood his rights by saying "yes" and "nodding yes" after he was read his rights. *Id.* at *2. The corrections officer, who observed the interview, testified that based upon his observations of the defendant during the interview as well as a conversation with the defendant after the interview, the defendant had no difficulty understanding his rights. *See id.* at *3.

In *United States v. Alaouie*, 940 F.2d 663, 1991 WL 144479 (6th Cir.1991)(per curiam), the defendant, a Lebanese citizen who had a "questionable" command of the English language, was advised of his *Miranda* rights after being arrested and acknowledged to DEA officers that he fully understood his rights. *See id.* at *1. The court held that the defendant's waiver was valid because the arresting officer took special care to explain the defendant's rights to him and the defendant acknowledged in English that he understood his rights. *See id.* at *5. In addition, the court noted that the defendant did not require the assistance of an interpreter at trial and gave all of his statements and testimony in English.[5] *See id.* In its analysis, the court cited a decision from the Ninth Circuit in *United States v. Bernard S.*, 795 F.2d 749 (9th Cir.1986). The defendant in *Bernard S.* was a juvenile whose native language was Apache. Before obtaining a statement from the defendant, the arresting officers read the defendant his rights from a standardized form and explained each individual right to the defendant. The defendant indicated that he understood his rights and stated that he was willing to sign a waiver form. Although the defendant neither read nor wrote English and required the assistance of an interpreter at trial, the court found that the evidence indicated that the defendant "understood his rights and voluntarily, knowingly, and intelligently waived them." *Bernard S.*, 795 F.2d at 752. The court observed, "[m]ost importantly, after [the officer] explained each of [the defendant's] rights to him in English, [the defendant] stated that he understood his rights." *Id.*

**5.** The Court does not consider the need for an interpreter at pretrial and trial proceedings to be determinative on the issue, but it may be a factor to be considered in the total mix of facts.

■ Thus, under the totality of the facts in this case, as set forth above, the Court concludes that Defendant understood his rights and that Defendant knowingly and intelligently waived those rights. The Court found that Deputy Warden Balli, who has no stake in this case, was very credible and that his testimony was consistent with the testimony of Swidwinski and Bush on the important points. In addition, as stated, the Defendant is an intelligent person with experience in the American criminal justice system who testified that during his previous arrests his rights were read to him in Spanish and that he understood his rights. This Court believes that it would have been preferable for the officers to have read Defendant his rights in Spanish, but it can understand why they did not do so in light of Defendant's own insistence that he understood these rights.[6]

## II. Voluntariness of Statement

■ Defendant also argues that his statements were involuntary because Agent Swidwinski and Detective Bush coerced Defendant into making his statements when they told him that he might get the death penalty but that he might be able to avoid the death penalty if he cooperated. The Sixth Circuit uses three factors to review a claim of coercion: (1) whether the police extorted the confession from the accused by means of coercive activity; (2) whether the police activity, if objectively coercive, was sufficient to overbear the will of the accused; and (3) whether the accused proved that her will was overborne by the coercive police activity in question. See McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988). The question of whether a confession was voluntarily obtained or was the product of unlawful coercion or duress "is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Busta-

monte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973).

In United States v. Little, 9 F.3d 110, 1993 WL 453396 (6th Cir.1993)(per curiam), the Sixth Circuit addressed whether statements substantially the same as those at issue in this case rendered the defendant's confession involuntary. In that case, the officers told the defendant that they had evidence to believe that he had committed or shared responsibility for a murder and that he could get the death penalty if convicted. The officers also told the defendant that he cold avoid the death penalty by cooperating with them and telling the truth. See id. at *2. Unlike the facts in this case, the officers in Little had been authorized by the United States Attorney to offer a reduced penalty. The district court found that the officers' statements, along with other circumstances, did not constitute coercive conduct. The court of appeals affirmed, stating:

> Here, the agents' promises were not illusory. The agents' unrefuted testimony was that they had consulted with the United States Attorney who authorized them to promise that the government would not seek the death penalty if he cooperated. The agents were not "leading the defendant to believe that he ... will receive lenient treatment when this is quite unlikely," but rather the agents made an offer of a reduced penalty that was authorized by the prosecution and thus capable of being carried out. Such an inducement is not improper.

Id. at *9 (alteration in original) (citations omitted).

■ In this case, the officers did not make any promises of leniency to Defendant. Rather, the officers told Defendant that there was a possibility that he could avoid the death penalty if he cooperated. Unlike the facts in Little, there was simply no promise. Thus, the facts in this case

---

**6.** This Court believes that some people will try to hide their illiteracy and even suffer imprisonment by not acknowledging their inability to read or write. Some people may even

pretend to be bilingual. This Court believes that this Defendant was not pretending when he indicated to the officers and to Balli that he understood what was being said to him.

are even less suggestive of improper coercion. In fact, some of the statements made by the officers to the defendant in *Little* regarding the evidence against the defendant were either misleading or not true. *See Little,* 9 F.3d 110, 1993 WL 453396, at *9. Here, there is no allegation by Defendant that the officers mischaracterized or lied about the evidence against Defendant at the time they obtained his statement. And there is no evidence that Swidwinski will not state that Defendant cooperated. In fact, Swidwinski testified under oath that Defendant did cooperate.

Finally, Defendant's statement to Balli after he was leaving the interview, that he was relieved that he had talked, is strong evidence that Defendant was not coerced into talking.

Therefore, this Court concludes that Defendant's statements were not the product of coercion.

### Conclusion

For the foregoing reasons, the Court will deny Defendant's motion to suppress his July 21, 1998, statements.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed on this date,

**IT IS HEREBY ORDERED** that Defendant's Motion To Suppress His July 21, 1998, Statements (docket no. 39) is **DENIED.**