**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Salam DANIEL, Defendant–Appellant.**

**No. 90–1456.**

United States Court of Appeals, Sixth Circuit.

Argued March 28, 1991.

Decided May 7, 1991.

William J. Richards, Asst. U.S. Atty. (argued), U.S. Dept. of Justice, Detroit, Mich., for plaintiff-appellee.

Patrick M. Cleary (argued), Bloomfield Hills, Mich., for defendant-appellant.

Before MERRITT, Chief Judge; GUY and NORRIS, Circuit Judges.

MERRITT, Chief Judge.

The defendant, Salam Daniel, an Iraqi national who is a permanent resident alien, appeals his jury conviction on firearms and drug trafficking charges: possession of unregistered dynamite in violation of 26 U.S.C. § 5861(d); use of a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c); and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). The question presented in this case is whether the District Court erred in admitting as evidence at Daniel's trial two of his own statements. Daniel made the first statement following a *Miranda*[1] warning but arguably under coercive circumstances. He made the second statement the following day after receiving a *Miranda* warning and after signing a written waiver. The District Court ruled that the first statement was not made under coercive circumstances and that both statements could be admitted. We affirm the defendant's conviction for the reasons set forth below.

\*    \*    \*    \*    \*    \*

A drug task force of the Michigan State Police executed a search warrant at 980 Fernhill in Detroit where officers found three-fourths pound of marijuana, five firearms including an AK–47, and 18 sticks of dynamite along with blasting caps and fuses. The Fernhill address is a residence, but the record does not make clear who lived there. It apparently was not the home of the defendant.

The defendant and two other people in the house were placed in custody for an hour or so: they were handcuffed, made to lie on the floor face down, and had their heads covered by a sheet while the police searched the house. The police covered the suspects' heads with a sheet so that they would not see undercover agents who were among the officers searching the house.[2]

During the execution of the search warrant Daniel made three inculpatory statements, only one of which the prosecution decided to enter into evidence at trial. On beginning their search and before giving *Miranda* warnings, the police asked about the location of any controlled substances, but the prosecution did not use at trial Daniel's statement made in response to this question. About ten minutes after the defendant and the others were placed on the floor in custody, one officer read the *Miranda* warnings to all three. The officer testified that after each portion of the warning he stopped and asked if each understood, and each said yes. He did not view the warning as preparation for interrogation but gave the warning because he wanted to be able to use any statement the defendant and the others might make. About ten minutes after the warning, an-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. It is not clear why the three persons in the house were placed in custody in this manner immediately after the police entered to execute the search warrant. The defendant, however, does not raise a false arrest claim or a claim that probable cause for restraint was missing.

other officer came into the room with an AK–47 and asked who owned it. No one answered. Almost immediately the officer who had given the *Miranda* warning asked the same question, and the defendant said he owned it. This statement was entered into evidence. Ten minutes or so after the question about the AK–47, another officer came in and asked about dynamite found in a bedroom. The defendant said a friend had found it and the two had divided it, the defendant storing his share at the Fernhill address. This statement was not entered into evidence.

After the search, Daniel was arrested and taken to Detroit Police Headquarters where he stayed the night. The following morning an officer, who had not been part of the search and who said he did not know of the statements made during the search, questioned Daniel. Before questioning him the officer gave Daniel a *Miranda* warning, asking the defendant to read the rights along with him. Daniel signed a "Constitutional Rights–Certificate of Notification" form. The officer then told Daniel that he had been arrested for possession of explosives, narcotics, and an AK–47 and asked Daniel if he understood the charges. Daniel said that he did. The officer then asked him about each of the items found at the Fernhill residence. Daniel admitted owning the dynamite and explained where it had come from, admitted selling marijuana but denied selling cocaine on which the search warrant was based, and admitted owning the AK–47.

\* \* \* \* \* \*

The defendant testified at his suppression hearing first that he had been given the *Miranda* warning prior to the statement about the AK–47, then that he had not, and then that he had answered the officers' questions because the officers promised leniency for the other two suspects, one of whom was Daniel's girlfriend. The District Court found, after listening to all the testimony, that the *Miranda* warning had been given prior to Daniel's statement that he owned the AK–47 and that no promise of leniency had been made.

The District Court then found that the statement as to the AK–47 made at the Fernhill residence and proposed as evidence was voluntary, despite the unusual circumstance of the sheet over the heads of the suspects. The Court relied on the reasonableness of the police officers' explanation for the sheet: the need to protect the identity of the officers. Because the Court considered the first confession not coerced, the second statement was in no way flawed. Both were admitted.

\* \* \* \* \* \*

■ We hold that even if the first statement was coerced, a question we do not reach, the second statement was voluntary, not tainted by any coerciveness arguably present during the first statement. This independently admissible statement is sufficient to uphold the conviction.

In order to decide the case before us, we look to United States Supreme Court cases that consider a court's admission into evidence of two kinds of statements: (1) warned statements which follow statements made in coercive circumstances and (2) involuntary statements.

The Supreme Court has several times considered cases in which a court has admitted second statements following prior involuntary statements. In evaluating the voluntariness of the second statement, as in evaluating the voluntariness of any confession, the Supreme Court looks to whether the defendant "knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement." *Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S. at 494, 495, 86 S.Ct. at 1638. The Court suggested that such factors as intervening time, removal of the prisoner to a different place, and change in identity of interrogators could make a second, warned statement voluntary, despite the prior involuntary statement. *See id.* at 496, 86 S.Ct. at 1639. *See also Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985) (reiterating these factors in case considering whether second statement, made

following a voluntary but unwarned statement, could be used at trial).

The Supreme Court set out this analysis for voluntariness in two cases decided some years ago: *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), and *Lyons v. Oklahoma*, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944).[3] In *United States v. Bayer* the Court, in reviewing a conviction by court martial, ruled that a confession elicited while the defendant was confined in isolation in a psychopathic ward of a hospital, while unusable at trial, did not preclude the use of a second confession made six months later when the defendant was confined only to the base where he was stationed. The second confession was warned, but was substantially the same as the first, though more detailed. The Court recognized the psychological effect of the "cat out of the bag" theory to the extent that in a general sense the later confession may always be partially the result of the first. *Bayer*, 331 U.S. at 540, 67 S.Ct. at 1398. Nevertheless, the "cat out of the bag" theory did not suffice to prevent the use of the second confession. The Court said that it would not hold that the first confession "perpetually disables the confessor from making a usable one" in new circumstances. *Id.* at 541, 67 S.Ct. at 1398. The Court noted the change in level of restriction and the passage of time which made the second confession usable, despite the fact that the defendant requested and was given a copy of his first statement before making the second and the fact that the second was referred to as "supplementary." *Id.* at 540, 67 S.Ct. at 1398.

In *Lyons v. Oklahoma*, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), a man was arrested and questioned. He apparently made no confession. He was kept in jail for eleven days, then questioned from six-thirty in the evening until two-thirty the following morning, with some evidence that he was assaulted. His interrogators placed a pan of the victim's bones in his lap to help elicit a confession. After making an oral confession he was taken to the scene of the crime and questioned further, then returned to the jail about eight-thirty in the morning. That afternoon, he was taken to the state penitentiary. That evening between eight and eleven he made a second confession which was introduced as evidence at his trial. *Lyons*, 322 U.S. at 598–600, 64 S.Ct. at 1210–11. Before Lyons made this second confession, he was warned that any statement he made would be used against him and that he should not " 'make a statement unless he voluntarily wanted to.' " *Id.* at 604, 64 S.Ct. at 1213. Lyons objected to the use of the second confession on the ground that it was involuntary. The question before the Court was whether "the unlawful inducements which vitiated the prior confession" continued to influence the second. *Id.* at 597, 64 S.Ct. at 1210. The Court said that in such circumstances,

[t]he question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. *Lisenba v. California*, 314 U.S. 219, 240 [62 S.Ct. 280, 291–92, 86 L.Ed. 166 (1941)]. The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of "mental freedom" to confess or to deny a suspected participation in a crime. *Ashcraft v. Tennessee*, 322 U.S. 143, 154 [64 S.Ct. 921, 926, 88 L.Ed.

---

**3.** Although both these cases were decided before the due process revolution, the Supreme Court in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), relied on *Bayer* for the proposition that "this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *Elstad*, 470 U.S. at 311, 105 S.Ct. at 1294, quoting *Bayer*, 331 U.S. at 540–41, 67 S.Ct. at 1398. The *Elstad* Court also cited *Lyons*. *See* 470 U.S. at 311–12, 105 S.Ct. at 1294–95 (noting that even "in such extreme cases as [*Lyons*], in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court assumed that the coercive effect of the confession could, with time, be dissipated").

1192 (1944) ]; *Hysler v. Florida,* 315 U.S. 411, 413 [62 S.Ct. 688, 689, 86 L.Ed. 932 (1942) ].

*Id.* at 602, 64 S.Ct. at 1212.

The Court in affirming Lyons' conviction said the first confession did not inevitably lead to the second and noted the twelve hour lapse of time and the transfer to a different place and to different control. The court also noted that Lyons knew the warden to whom he gave the second confession and was not afraid of him. *Id.* at 604, 64 S.Ct. at 1213.

In reviewing the admission of Daniel's second statement we look to the factors the Supreme Court identified as significant in making a second, warned statement voluntary despite any coerciveness surrounding the first statement. In the case before this Court, the defendant's second statement was made after a clean break from the circumstances which surrounded the first statement. The Record suggests no effort was made to begin or to continue any questioning that same night. Rather, a police officer questioned the defendant the following day. The defendant had been moved to a different place, and the interrogating officer had not been among those who conducted the search the day before. The police officer carefully gave the *Miranda* warning, told the defendant what he was being charged with, and asked the defendant whether he understood the charges. The defendant gave a significantly elaborated statement during the interrogation on the second day. These factors, taken together, show a knowing and intelligent waiver of the right to remain silent and consult counsel before making a statement.

■ The case before this Court involves the admission not only of the second, untainted statement as was considered in *Bayer* and *Lyons* but also the admission of the first statement, arguably made under coercive circumstances. Assuming without deciding that the first statement as to ownership of the AK–47 was made under coercive circumstances and its admission was error, admission of that statement is now subject to harmless error analysis under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Arizona v. Fulminante,* — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante* the Supreme Court ruled for the first time that admission of a coerced confession is subject to harmless error analysis. The Court looked to such factors as whether conviction depended on the jurors' believing the coerced confession, whether the jury's evaluation of an additional, uncoerced confession would rely on its relation to the coerced confession, and whether admission of the coerced confession led to admission of other evidence. *See* — U.S. at — – —, 111 S.Ct. at 1255–56. The Court concluded that the coerced confession was so interwoven with the second, admissible confession as to make it impossible to say that admission of the first was harmless error. *Id.*

Under *Chapman* " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " 386 U.S. at 23, 87 S.Ct. at 827, quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). The *Chapman* Court also suggested the criterion whether, absent the error, the jury might have found the defendant not guilty. *See id.* 386 U.S. at 25–26, 87 S.Ct. at 828–29.

Because Daniel's second statement acknowledged ownership of the dynamite, the marijuana, and the AK–47 and supplied greater information than the first statement admitting ownership of the AK–47, the first statement was cumulative and unnecessary to establishing the case against the defendant. Furthermore, we have reviewed the entire trial transcript and our examination shows no special emphasis on the first statement in which Daniel said the AK–47 was his. The police officer who stood guard over the three persons in custody at the Fernhill residence testified as to Daniel's answer acknowledging ownership. A different officer presented the second, written statement, a copy of which was enlarged as an exhibit. No connection, reliance, or relation back to the first oral statement was developed when the written

statement was introduced. Use of the first statement was not required in order to admit other testimony. Moreover, Daniel's first statement was not a full confession but only a partial statement, acknowledgment of ownership of the AK–47. There is nothing in Daniel's first statement which adds to or places a new light on the case against Daniel, in any way different from what the more complete written statement accomplished. We thus find that introduction of the first statement, if error, was harmless error.

The defendant argues no other ground for appeal.[4] We thus affirm the judgment of the District Court.

---

**4.** No question was raised concerning probable cause for securing the Fernhill residence and