16 F.3d 1223
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Collin TAPLIN, Jr., Defendant-Appellant.
 No. 92-6628.
 United States Court of Appeals, Sixth Circuit.
 Jan. 12, 1994.
 
 Before: BOGGS and SUHRHEINRICH, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Tennessee law-enforcement officers stopped Collin Taplin, Jr. on an interstate highway as he was transporting two kilograms of cocaine from Texas to Tennessee. During the ensuing search and seizure of his vehicle, which was later found to have violated Taplin's Fourth Amendment rights, Taplin confessed his role in the drug scheme. More than two weeks later, Taplin again confessed his role in the crime, this time while talking by telephone from Texas to a narcotics agent in Tennessee. The district court suppressed the first confession as evidence against Taplin. However, the court admitted the second confession over Taplin's motion in limine. Taplin appeals from the denial of his motion in limine. For the reasons set forth below, we affirm the district court's ruling.
 
 
 2
 * On March 2, 1989, two narcotics investigators of the Tennessee Highway Patrol (THP) stopped a red Ford Tempo going eastbound on Interstate 40, near Highway 70, in Haywood County. They detained Collin Taplin, Jr. and called for a trained canine to conduct a sniff test for drugs.
 
 
 3
 Eventually, the dog arrived, sniffed, and responded positively, signaling the presence of drugs in the Tempo. The THP then transported both the car and its driver to their base, where the car was searched, and police discovered two kilograms of cocaine. At this point, an officer read Taplin his Miranda rights and informed him that he was now under arrest. The THP called in Special Agent Mehr, supervisor of the West Tennessee Narcotics Unit of the Tennessee Bureau of Investigation. Mehr interviewed Taplin, and Taplin told the agent that he had been pressed by Preston Bailey to transport the drugs as a means of meeting financial obligations to Bailey for a personal loan that Taplin had received from him. In the course of his interview with Mehr, Taplin described his version of the scene in Texas when Bailey, accompanied by an associate who drove a white Mazda pickup truck, had loaded the drugs into the red Tempo. Taplin offered to cooperate with Mehr in an investigation of Bailey. He also offered to try to find and identify, back in Texas, both the associate of Bailey whom he had described and that man's white Mazda pickup truck.
 
 
 4
 Taplin was permitted to return to Texas. Shortly after he arrived there, his Texas attorney, Kirby Taylor, contacted Mehr and notified him that he was representing Taplin. Mehr advised Taylor that Taplin was cooperating with Tennessee law-enforcement authorities. Mehr testified that Taylor had "agreed that [it] was okay" for the client and the agent to communicate.
 
 
 5
 After returning to Texas, Taplin failed to call Mehr with the promised information, so Mehr phoned him, leaving several messages. Eventually, some two weeks after their original encounter in Tennessee, Mehr and Taplin spoke on the phone. Taplin explained that he had been unsuccessful in his efforts to locate the white Mazda that he had described, or to identify its driver. In the course of the interstate phone conversation, Taplin incidentally recounted various incriminating aspects of his role as Bailey's drug courier ("the second confession").
 
 
 6
 On June 19, a federal grand jury indicted both Taplin and Bailey, charging that they had possessed two kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2, and that they had conspired to do so, in violation of 21 U.S.C. Sec. 846. At trial, Taplin successfully moved to suppress evidence that had been derived from the initial Tennessee search and seizure.[1] However, the court also found that Taplin's telephone conversations with Mehr that occurred two or more weeks later could be admitted as evidence because "an independent intervening act of [Taplin's] free will" had succeed in "attenuating the taint of the fruit of the poisonous tree."
 
 
 7
 When his motion in limine to suppress the second confession was denied, Taplin pleaded guilty to both counts as charged, reserving the right to appeal the motion's denial. We now consider that appeal.
 
 II
 
 8
 In United States v. Daniel, 932 F.2d 517 (6th Cir.), cert. denied, 112 S.Ct. 252 (1991), this court was presented with a "second confession" question similar to that at the heart of this appeal. A drug task force of the Michigan State Police, while executing a search warrant at a residence, found Salam Daniel on the premises. He was handcuffed, compelled to lie on the floor face down, and had his head covered by a sheet while the police searched.[2] During the search, Daniel made three inculpatory statements. After the search, he was arrested and was brought to Detroit Police Headquarters, where he stayed overnight. The next morning, an officer who had not participated in the previous day's events and who claimed to know nothing of Daniel's earlier statements, questioned Daniel. The officer first notified him of his Miranda rights. Daniel then made new inculpatory statements. In evaluating Daniel's request to suppress his second confession, this court held that:
 
 
 9
 even if the first statement[§ were] coerced, a question we do not reach, the second statement was voluntary, not tainted by any coerciveness arguably present during the first statement. This independently admissible statement is sufficient to uphold the conviction.
 
 
 10
 ....
 
 
 11
 [T]he defendant's second statement was made after a clean break from the circumstances which surrounded the first statement.... [N]o effort was made to begin or to continue any questioning that same night. Rather, a police officer questioned the defendant the following day. The defendant had been moved to a different place, and the interrogating officer had not been among those who conducted the search the day before. The police officer carefully gave the Miranda warning.... The defendant gave a significantly elaborated statement during the interrogation on the second day. These factors, taken together, show a knowing and intelligent waiver of the right to remain silent and [to] consult counsel before making a statement.
 
 
 12
 Id. at 519, 521.
 
 
 13
 In holding as it did, this court commented on the psychological effect of the "cat out of the bag" theory, which contends that an inadmissible first confession taints later "admissible" confessions because, once police have illegally extracted the information they want, they can take unfair advantage of "fruit from the poisonous tree." However, this court noted that the Supreme Court had rejected that theory long ago. United States v. Bayer, 331 U.S. 532, 540 (1947).
 
 
 14
 In Westover v. United States, 384 U.S. 436, 494, 496 (1966), which was decided together with Miranda v. Arizona, the Court offered some factors that could make a second confession admissible, even after an inadmissible earlier one. Such a second confession could be admissible "if an accused were taken into custody by [a] second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." Id. at 496.
 
 
 15
 The Court also discussed the second confession issue in Lyons v. Oklahoma, 322 U.S. 596 (1944), which involved a dramatic fact pattern that saw officers attempt to extract a confession first by holding a suspect in jail for eleven days, then by questioning him for eight consecutive hours between 6:30 p.m. and 2:30 a.m., and even by placing in his lap a pan that contained the victim's bones. The suspect orally confessed between 2:00 and 4:00 a.m. He was then taken to the scene of the crime, was questioned further, was then brought back to jail at 8:30 a.m., and was then brought to the state penitentiary in the afternoon. That evening, between 8:00 and 11:00 p.m., he made a second confession. Id. at 598-600. Even under those egregious circumstances, the Court would not automatically rule out the second confession's admissibility:
 
 
 16
 The question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of "mental freedom" to confess to or deny a suspected participation in a crime.
 
 
 17
 Id. at 602 (citations omitted).
 
 
 18
 In another Supreme Court case, dealing with the related question of a delayed first confession, a suspect was arrested, without either a warrant or probable cause, on charges of distributing drugs. Therefore, any evidence that would have been secured by the police as a result of the arrest would have been excludable. After being lawfully arraigned, the suspect was released on his own recognizance. He then returned to the police several days later, animated apparently by his own initiative, to confess his guilt. Wong Sun v. United States. 371 U.S. 471, 491 (1963). The Court held that the wrongfully arrested suspect's confession "was not the fruit of that [wrongful] arrest, and was therefore properly admitted at trial.... [T]he connection between the [wrongful] arrest and the statement had 'become so attenuated as to dissipate the taint.' " Ibid. (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).
 
 
 19
 In this case, Taplin's first encounter with the Tennessee narcotics officers culminated in what was held to be an unlawful search and seizure. Therefore, the district court suppressed all evidence that emanated from that incident, including Taplin's initial confession. Nevertheless, the court found that Taplin's subsequent Texas phone conversations with Mehr were admissible.
 
 
 20
 This court held in Daniel that a suspect's movement from a Detroit residence to a Detroit police station, albeit while in constant police custody, constituted a significant enough change of location to make a "second confession" an independent event. Moreover, the passage of less than twenty-four hours, from Daniel's first confession in the afternoon to the second confession on the morning of the next day, constituted a significant enough passage of time to make the "second confession" independent and separate from the first. In this case, the facts are even stronger for the independence of the second confession. Taplin's geographical movement, between the times of the two confessions, was interstate. His first suppressed confession was uttered in Jackson, Tennessee; his second confession was spoken more than 600 miles southwest of that site, while he was in Texas. Moreover, he was free from physical custody in Texas. In addition, at least two weeks had passed between the Tennessee confession and that from Texas.
 
 
 21
 We are aware that some of the distinguishing aspects of this case are less favorable than in Daniel. For example, in Daniel, different police officers conducted the different questioning phases. By contrast, in this case Special Agent Mehr conducted the interview in Jackson, Tennessee, that elicited the first confession, and he maintained the telephone link with Taplin in Texas that resulted in the second confession. Nevertheless, the passage of more than two weeks' time since the first confession, together with the defendant's release from custody and travel to a different state, outweigh Mehr's continued role as a bar to the second confession's admissibility.
 
 
 22
 Finally, Taplin contends that Mehr had no right to communicate directly with him once he was represented by counsel. However, Taplin's attorney, Mr. Taylor, did contact Mehr initially, and Mehr notified Taylor that Taplin was cooperating with Mehr. By formally notifying Taylor that he was communicating with Taplin, Mehr assured that Taplin would benefit from whatever legal counsel, advice, and protection that his chosen attorney could provide. Taylor could have picked up the phone and instructed his client to refrain from talking with Mehr in Taylor's absence. Alternatively, Taylor could have adopted a strategy that would have encouraged Taplin to speak uninhibitedly with Mehr, in the hope of winning a sentence reduction later.[3] Regardless of whether attorney Taylor adopted a wise defense strategy, he was on notice that his client and Agent Mehr were communicating, and there is evidence on the record that he consented to his client's behavior.
 
 III
 
 23
 For the foregoing reasons, the district court's decision to deny Defendant-Appellant's motion in limine is AFFIRMED.
 
 
 
 [1]
 Because they do not pertain to the issue under appeal, we need not elaborate on the district court's reasons for suppressing the evidence that was obtained during the stop, search, and seizure in Tennessee. The Government does not contend, on this appeal, that the stop and search of Taplin's car by the Tennessee authorities was a legal one
 
 
 [2]
 The police explained that they felt compelled to place the sheet over Daniel's head, and to restrain him as they did, in order to prevent him from seeing the undercover agents who participated in the search of the premises
 
 
 [3]
 Indeed, Taplin received a sentence reduction, upon motion by the Government under U.S.S.G. Sec. 5K1.1 for a downward departure, in return for substantial assistance that he had rendered