# UNITED STATES COURT OF APPEALS

**FOR THE FOURTH CIRCUIT**

UNPUBLISHED

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

No. 99-4644

WINNIE LEIGH JUMPER,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(CR-99-48)

Argued: December 4, 2000

Decided: February 20, 2001

Before WILKINSON, Chief Judge, and LUTTIG and
MICHAEL, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Luttig wrote the opinion, in
which Chief Judge Wilkinson and Judge Michael joined.

_____

## COUNSEL

**ARGUED:** Ronald Carl True, Asheville, North Carolina, for Appellant. Brian Lee Whisler, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

LUTTIG, Circuit Judge:

Appellant Winnie Jumper appeals from her conviction for involuntary manslaughter under 18 U.S.C. § 1112 and from the sentence imposed on her by the district court pursuant to the United States Sentencing Guidelines ("U.S.S.G."). For the reasons set forth below, we affirm.

I.

In March 1998, an employee at the Cherokee Indian Reservation, where appellant Winnie Jumper lived, found a bag containing the skeletal remains of an infant. Agent James Russell of the Federal Bureau of Investigation ("FBI") determined that the bag belonged to Jumper's aunt and suspected that Jumper had given birth to the deceased child. Thus, on March 27, 1998, Russell questioned Jumper at her place of employment.

Jumper initially denied that she had been pregnant but later admitted that she was the mother of the deceased infant. She recounted that in August 1997, she experienced labor pains while at work. She considered going to the hospital but decided against seeking medical care because she did not want her father and boyfriend to learn of her pregnancy. Instead, she went to her father's house, knowing that it would be empty, and gave birth there alone. Jumper claimed that the child neither moved nor cried when it was born. She wrapped the baby in a towel and placed it on the bed while she attempted to stop her hemorrhaging. Believing the child was dead, she then placed it in a bag and drove to a spot on the reservation where she left the bag under a rock.

Following the interview of March 27, Jumper agreed to take a polygraph test, which was administered by FBI Agent Robert Drdak

on April 3, 1998. Drdak told Jumper after the test that she had failed the polygraph and that he believed the baby had been born alive. Jumper then admitted, contrary to her previous assertions, that the baby had, in fact, moved and cried after it was born. She claimed that she left the baby wrapped in a towel while she went to the bathroom. When she returned, she realized that the baby had turned blue and stopped breathing, but she did not seek medical attention. Shortly thereafter, though she had no medical confirmation of the child's death, Jumper hid the infant in a bag under a rock.

On April 27, 1998 — twenty-four days after Jumper made her statement to Drdak — Russell went to the home of Jumper's aunt, where Jumper was then living, to ask Jumper further questions about the events following the birth of her baby. In particular, Russell wanted to inquire about the discrepancies between Jumper's two prior statements to the FBI. Russell assured Jumper that she was not under arrest. They spoke at the kitchen table, with Jumper's aunt in the next room, and Jumper essentially reiterated the information she provided to Drdak on April 3 — including the critical admissions that the baby had moved and made noise when it was born, and that she did not seek medical attention even after the baby stopped breathing.

Jumper was indicted for involuntary manslaughter pursuant to 18 U.S.C. § 1112. She filed a pre-trial motion to suppress all three statements that she made to the FBI. The district court suppressed the first two statements, holding that they were constitutionally involuntary. However, the court held that the third statement was voluntary and admissible. The jury found Jumper guilty of involuntary manslaughter. The district court denied Jumper's post-trial motion for acquittal or for a new trial, overruled Jumper's objections to the presentence report ("PSR"), and denied her motion for downward departure from the applicable range of the Sentencing Guidelines. The court sentenced Jumper to fifteen months imprisonment — the minimum penalty provided by the Guidelines for her total offense level and criminal history category.[1] Jumper filed a timely notice of appeal challenging her conviction and sentence.

---

[1]Under the Guidelines, the range of punishment for a defendant with a total offense level of 14 and a criminal history category of I is 15 to 21 months imprisonment.

## II.

Jumper first claims that the district court erred in denying her motion to suppress the statement she made to Russell on April 27, 1998. She argues that her statement was inadmissible because it was elicited in violation of the Fifth Amendment. Alternatively, she contends that the statement should have been suppressed as derivative evidence of her earlier confession made on April 3, 1998, which the district court held to be involuntary.[2] Reviewing legal conclusions made pursuant to the district court's suppression determination de novo, *United States* v. *Seidman*, 156 F.3d 542, 547 (4th Cir. 1998), we hold that the district court did not err in denying the motion to suppress the statement of April 27.

## A.

A defendant's statement must be suppressed if it is involuntary within the meaning of the Fifth Amendment, which guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law." U.S. Const. Amend. V. A confession is involuntary under the Fifth Amendment only if "the defendant's will has been overborne or his capacity for self-determination critically impaired," *United States* v. *Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987), due to "coercive police activity," *Colorado* v. *Connelly*, 479 U.S. 157, 167 (1986).

There is no evidence that Jumper's statement of April 27 was coerced. Russell conducted the interview around the kitchen table of Jumper's home, with her aunt nearby. *See Oregon* v. *Elstad*, 470 U.S. 298, 315 (1985) (environment not coercive where interview took

---

[2]At oral argument before this court and in the court below, J.A. 126-27, Jumper's counsel conceded that the statement of April 27 did not take place in a custodial setting and that *Miranda* warnings were therefore not required. *See California* v. *Beheler*, 463 U.S. 1121, 1123 (1983) (stating that *Miranda* warnings are only applicable in a custodial setting). Thus, the only remaining issues surrounding the admissibility of the statement of April 27 statement are whether it was constitutionally involuntary and whether it was inadmissible as derivative evidence of a prior constitutional violation.

place in living room of defendant's home, with his mother in the kitchen); *United States* v. *Braxton*, 112 F.3d 777, 785 (4th Cir. 1997) (statement not involuntary where defendant "was interviewed by law enforcement officers around the kitchen table in his mother's home"). Before the interview, Russell assured Jumper that she was not under arrest. Once the interview began, he did not harm or threaten to harm Jumper if she did not answer his questions; he did not deprive her of food or sleep; he did not subject her to a lengthy period of isolation or interrogation; and he did not attempt to deceive her in an effort to extract a confession. *See United States* v. *Elie*, 111 F.3d 1135, 1143 (4th Cir. 1997) (discussing factors that would render a confession involuntary). Nothing in the record suggests that Jumper's statement of April 27 was elicited through any coercive conduct by Russell, and we therefore conclude that her statement was voluntary within the meaning of the Fifth Amendment.

## B.

Jumper alternatively contends that, whether or not there was coercive police conduct on April 27, her statement to Russell should have been suppressed as "fruit of the poisonous tree." Specifically, Jumper argues that the statement of April 27 should have been suppressed because the interview would not have taken place were it not for Jumper's admission to Drdak on April 3 that the baby was born alive — an admission that the district court held to be constitutionally involuntary.

We reject this argument as well. For, when a confession is derivative of an earlier statement obtained in violation of the defendant's constitutional rights, the subsequent confession is admissible if it is voluntarily made, free from the taint of earlier coercion. *See Lyons* v. *Oklahoma*, 322 U.S. 596, 603 (1944); *Howard* v. *Moore*, 131 F.3d 399, 414 (4th Cir. 1997) ("Only if [appellant] could show that his [initial] statement . . . was obtained in violation of [the] Fifth Amendment . . . and that insufficient time had passed to dissipate the taint, might the 'fruit of the poisonous tree' doctrine bar admission of [his] subsequent confessions . . . .").

Even assuming arguendo that the statement of April 3 was constitutionally involuntary, as the district court held, Jumper's statement of

April 27 was admissible because any coercion associated with the former statement did not taint the latter confession. Twenty-four days passed between the two statements — a period far in excess of the time required to dissipate taint from earlier coercion. *See Lyons*, 322 U.S. at 604 (twelve hours sufficient to dissipate taint from prior statement obtained through physical abuse); *Holland* v. *McGinnis*, 963 F.2d 1044, 1050-51 (7th Cir. 1992) (six hours "provide[d] a meaningful interlude" that dissipated taint from police beating); *United States* v. *Daniel*, 932 F.2d 517, 521 (6th Cir. 1991) (one day); *United States* v. *Manuel*, 706 F.2d 908, 912 (9th Cir. 1983) (eighteen hours). Furthermore, the questioning on April 27 was conducted by a different FBI Agent and in a different location than the questioning on April 3. *See Elstad*, 470 U.S. at 310 (explaining that "the change in place of interrogations and the change in identity of the interrogators . . . bear on whether [prior] coercion has carried over into [a] second confession"). Accordingly, we hold that the district court did not err in denying Jumper's motion to suppress her statement of April 27, 1998.

### III.

Jumper next claims that the evidence against her was insufficient to support a conviction for involuntary manslaughter, and that the district court therefore erred in denying her motion for acquittal or for a new trial. We review the sufficiency of the evidence by determining whether "there is substantial evidence, taking the view most favorable to the government, to support" the verdict. *Glasser* v. *United States*, 315 U.S. 60, 80 (1942). Under 18 U.S.C. § 1112(a), involuntary manslaughter is defined in pertinent part as "the unlawful killing of a human being without malice . . . in the commission . . . without due caution and circumspection, of a lawful act which might produce death."[3] Involuntary manslaughter also requires proof that the defen-

---

[3]In its entirety, the statute defines manslaughter as follows:

Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a).

dant acted with gross negligence, which is shown by "wanton or reckless disregard for human life." *United States* v. *Pardee*, 368 F.2d 368, 374 (4th Cir. 1966).

Jumper's statement of April 27 established that the baby was born alive and subsequently died during Jumper's attempt at home birth. J.A. 207-34. The jury could reasonably have concluded that Jumper performed that home birth — "a lawful act which might," and in this case did, "produce death" — "without due caution and circumspection." 11 U.S.C. § 1112(a). The evidence presented at trial established that Jumper had given birth in a hospital twice before, J.A. 211-14, from which the jury could have inferred that she was aware of the myriad complexities of childbirth and the benefits of proper medical care. Nonetheless, Jumper decided to give birth alone at her father's empty home, after considering and rejecting the idea of going to a hospital. J.A. 211. Furthermore, the jury heard evidence that Jumper failed to seek medical attention for the infant even after she realized the child had stopped breathing; instead, with no medical confirmation that the child was dead, she placed the infant in a bag, which she subsequently hid under a rock. J.A. 217. The jury could reasonably have concluded that by attempting a home birth without any assistance, and foregoing medical care even after the baby ceased breathing, Jumper acted "without due caution and circumspection," resulting in the child's death.

Moreover, testimony at trial established that Jumper told Russell that she did not go to the hospital because she wanted to hide her pregnancy from her father, who was angry about her previous pregnancies, and from her boyfriend, who had threatened to take away her two older sons and to force her to move out of his parents' home if she became pregnant again. J.A. 210-14. Based on all the evidence before it, the jury could reasonably have accepted the government's theory of the case — that Jumper knew the risk posed by her conduct, yet recklessly or even intentionally failed to seek medical attention because she did not want a third child. A rational jury could have concluded that such conduct constituted the "wanton or reckless disregard for human life" required to establish gross negligence. *Pardee*, 368 F.2d at 374. Accordingly, the district court did not err in denying Jumper's post-trial motion for acquittal or a new trial.

IV.

Finally, Jumper challenges the district court's application of the Sentencing Guidelines. First, she argues that the district court erred in classifying her conduct as "reckless" rather than "criminally negligent" under U.S.S.G. § 2A1.4. Second, she contends that the district court erred in denying her motion for downward departure based on the allegedly aberrational nature of her behavior.

A.

Under U.S.S.G. § 2A1.4, which prescribes sentencing ranges for defendants convicted of involuntary manslaughter pursuant to 18 U.S.C. § 1112, conduct that is "reckless" carries a base offense level of 14, and conduct that is "criminally negligent" carries a base offense level of 10. "Reckless" is defined as:

> a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. The term thus includes all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. § 1112.

U.S.S.G. § 2A1.4, cmt. n.1. "Criminally negligent," in turn, is described as:

> [c]onduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless.

U.S.S.G. § 2A1.4, cmt. n.2.

On appeal, we must "accept the findings of fact of the district court unless they are clearly erroneous and give due deference to the district court's application of the Guidelines to the facts." *United States* v. *Cutler*, 36 F.3d 406, 407 (4th Cir. 1994). We cannot say that the district court's factual findings are "clearly erroneous." Jumper's state-

ment to Russell, J.A. 207-34, amply supports the district court's findings that Jumper:

> had previously given birth to two children, hid her second pregnancy, denied her third pregnancy, gave birth at home after considering and rejecting the idea of medical assistance, and after the child's birth, failed to seek medical assistance when the child ceased breathing, subsequently placing the child in a bag and hiding it under the rock.

J.A. 309. Nor, giving "due deference to the district court's application of the Guidelines to the facts," can we say that the district court erred in concluding that Jumper's conduct was "reckless" within the meaning of U.S.S.G. § 2A1.4. As the Application Notes indicate, "all, or nearly all, convictions for involuntary manslaughter under 18 U.S.C. § 1112" involve "reckless" conduct. U.S.S.G. § 2A1.4, cmt. n.1. This case is no exception. The evidence fairly supports the inference that Jumper knew that the health and life of her child were endangered by her decision to give birth at home without any aid, and especially by her subsequent insistence on foregoing medical attention even after the child stopped breathing. Disregarding such a risk to an infant constitutes the "gross deviation from the standard of care that a reasonable person would exercise" necessary for a finding of recklessness under the Guidelines. *Id.*

### B.

Jumper also argues that the district court erred by denying her motion for downward departure from the applicable range of the Sentencing Guidelines. Review of a district court's refusal to depart downward is only available "when the district court mistakenly believed that it lacked the authority to depart." *United States* v. *Edwards*, 188 F.3d 230, 238 (4th Cir. 1999). Jumper is unable to point to any evidence in the record that the district court misperceived its authority to depart. On the contrary, the presentence report adopted by the district court discusses Jumper's theory that she was entitled to downward departure for a single act of aberrant behavior, explains that her theory is "not forbidden or proscribed by the sentencing guidelines," cites caselaw in which downward departure for aberrant behavior has been recognized, and states that "the Court will need to

determine whether Jumper's actions warrant a downward departure for a single act of aberrant behavior." J.A. 315. Further, the district court heard oral argument on the factual basis for downward departure — whether Jumper's conduct actually constituted aberrant behavior — before denying the motion. J.A. 287-91. Because nothing in the record suggests that the district court misperceived its authority to depart, review of the district court's refusal to depart is unavailable.

## *CONCLUSION*

For the reasons stated herein, we affirm Jumper's conviction and sentence.

*AFFIRMED*